Robert S. TOPE, Judith Tope, and Tope
Equipment Company, Appellants,

v.

James H. CHRISTIANSON, as Successor
in Interest to James W. Christianson,
Appellee.

Nos. S–7865, S–7925.

Supreme Court of Alaska.

June 5, 1998.

Cabot Christianson and Gary Spraker, Bundy & Christianson, Anchorage, for Appellants.

John R. Beard, Anchorage, for Appellee.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH and BRYNER, JJ.

## OPINION

EASTAUGH, Justice.

### I.  INTRODUCTION

The superior court dismissed a claim by the present owners of real property to recover environmental remediation costs from the prior owners who allegedly contaminated the soil.  Because this remediation claim was not preserved in the landowners' prior bankruptcy proceeding in which the predecessor owners were creditors, we hold that the doctrine of res judicata bars the landowners' claims and affirm the judgment below.

### II.  FACTS AND PROCEEDINGS

Judith and Robert Tope purchased two lots of land from James W. Christianson in May 1984.  The Topes signed a promissory note for $450,000 of the purchase price, and a deed of trust to the property to guarantee the sale.  The Topes conveyed both lots to Tope Equipment Company (TEC), of which the Topes are the only shareholders.[1]

TEC became delinquent on the note, and in March 1988 Christianson sued the Topes for the principal and interest due on the note—a total of $472,448.11, plus interest accruing between the default and the date of judgment.  *Christianson v. Tope*, No. 3AN–88–3131 Ci. (Alaska Super., February 16, 1993) ("*Christianson I* ").  Christianson amended his complaint to join TEC and to request foreclosure on the deed of trust.  In October 1988 TEC filed for bankruptcy in the United States Bankruptcy Court for the District of Alaska, thus staying the action as to TEC.

Christianson continued his collection action against the Topes individually and moved for summary judgment.  In September 1989 the Topes opposed Christianson's motion for summary judgment, stating that they had discovered two makeshift underground fuel storage tanks on the property during the course of the state court litigation.  One tank had leaked, and it failed environmental tests in March 1989.  The Topes testified that they had spent over $77,000 to correct the environmental damage caused by the leak, and that they believed that the total cost to dispose of the contaminated soil may exceed $150,000.

In October 1989 the superior court granted summary judgment to Christianson, holding the Topes personally liable on the deed-of-trust note for $445,210.96, plus interest.  The court also allowed the Topes to amend their answer to assert a counterclaim against Christianson for the costs of the environmental remediation.  In November 1989 the Topes moved for relief from judgment and for a stay of execution until the adjudication of their counterclaim.  Their motions were denied.  The Topes filed individually for bankruptcy in June 1990, staying Christianson's state court case against them.

In the bankruptcy court, TEC moved under 11 U.S.C. § 506(c) to charge Christianson for the remediation costs.[2]  On Novem-

---

1.  TEC now owns the property and does business on it.

2.  11 U.S.C. § 506(c) "permits the bankruptcy trustee to recover administrative expenses from a secured creditor's collateral" under certain circumstances to prevent the creditor from "reap[ing] the benefit of actions taken to preserve the secured creditor's collateral without

ber 1, 1990, the bankruptcy court denied TEC's motion, reasoning that costs charged to the secured creditor under § 506(c) must be primarily for the benefit of the secured creditor rather than for the benefit of the debtor. Noting that TEC planned to continue using the property, the bankruptcy court concluded that the remediation costs would primarily benefit TEC, not the secured creditor. The bankruptcy court therefore denied TEC's § 506(c) motion without addressing the merits of the remediation counterclaim.

While the § 506(c) motion was pending, TEC and the Topes submitted their financial disclosure statements. TEC filed its second amended plan of reorganization on November 21, 1990, three weeks after the bankruptcy court denied TEC's § 506(c) motion. In the spring of 1991, the bankruptcy court confirmed that plan, which did not disclose TEC's intention to pursue the counterclaim against Christianson after the bankruptcy proceedings. As part of the confirmed plan, TEC gave Christianson two promissory notes: one for $150,000, secured by a lien on one of the lots; and one for $188,900, for the unsecured portion of the purchase price of the two lots. James W. Christianson transferred the second note to his father, James H. Christianson, in May 1993.[3]

TEC paid the $150,000 note; it is not at issue here. On the second note, however, TEC paid about $98,000, leaving about $90,000 unpaid. In April 1996 Christianson sued TEC for the remaining $90,000. *Christianson v. Tope Equip. Co.*, No. 3AN–96–2654 Ci. (Alaska Super., September 24, 1996) ("*Christianson II*").

TEC answered in May 1996, denying the allegations and asserting the affirmative defense of setoff. In June 1996 TEC moved to amend its answer to assert the costs of the

environmental remediation as either a counterclaim or an affirmative defense. TEC also asked the superior court to consolidate this case with *Christianson I*.

In September 1996 the superior court granted Christianson summary judgment in *Christianson II* (the action against TEC for the last $90,000). The superior court entered judgment against TEC for $111,289.89 (principal, interest, and attorney's fees), plus interest from the date of judgment until payment.

In January 1993 the clerk of the superior court had entered a notice of intent to dismiss *Christianson I* for failure to prosecute. The notice apparently reached Christianson, but it never reached the Topes, TEC, or their attorney. The superior court dismissed the case without prejudice on February 16, 1993. In June 1996 TEC and the Topes moved to set aside the *Christianson I* dismissal and to consolidate *Christianson I* and *Christianson II*; the court denied those motions and denied the subsequent motion by TEC and the Topes for reconsideration.

The Topes appeal the denial of the motion to set aside the dismissal of *Christianson I*, and TEC appeals the summary judgment against it in *Christianson II*.[4]

## III. *DISCUSSION*

■ Christianson contends that the superior court correctly granted him summary judgment in *Christianson II*.[5] He asserts that TEC is bound by the terms of the confirmed bankruptcy reorganization plan, which does not specifically reserve the environmental counterclaim, and by TEC's failure to assert its counterclaim during the bankruptcy proceeding. He argues that res judicata, estoppel, and the statute of limita-

---

paying the cost." 5 Lawrence P. King, *Collier on Bankruptcy* ¶ 506.05, at 506–125 (15th ed.1997).

3. We refer to both James H. Christianson (the father) and James W. Christianson (the son) as "Christianson" throughout this opinion, as the Christiansons did in their brief, denoting the son until 1993 and the father thereafter.

4. *Christianson I* and *Christianson II* were consolidated on appeal.

5. We review a superior court's grant of summary judgment de novo. *Public Safety Employees Ass'n v. State*, 895 P.2d 980, 984 (Alaska 1995). Summary judgment is appropriate if " 'the evidence in the record fails to disclose a genuine issue of material fact and the moving party is entitled to judgment as a matter of law.' " *Dayhoff v. Temsco Helicopters, Inc.*, 848 P.2d 1367, 1369 (Alaska 1993) (quoting *Dayhoff v. Temsco Helicopters, Inc.*, 772 P.2d 1085, 1086 (Alaska 1989)).

tions bar the Topes or TEC from asserting the counterclaim.[6]

TEC agrees that confirmed reorganization plans are final and binding for purposes of res judicata. Nonetheless, it reasons that it should be allowed to proceed with its environmental remediation claim because it reserved the claim during the bankruptcy proceeding, and because both parties, as well as the bankruptcy court, understood that the claim would survive the bankruptcy. TEC also reasons that the statute of limitations should not prevent it from litigating its claim because TEC seeks only an offset or recoupment, not an affirmative recovery.

The superior court granted summary judgment to Christianson, but did not enter findings of fact or conclusions of law. We hold that res judicata bars TEC from asserting its counterclaim now.

We have explained that, under the doctrine of res judicata,

a judgment in a prior action operates as a bar to a subsequent action if (1) the prior judgment was a final judgment on the merits, (2) a court of competent jurisdiction rendered the prior judgment, and (3) the same cause of action and same parties or their privies were involved in both suits.

*Blake v. Gilbert,* 702 P.2d 631, 634–35 (Alaska 1985), *overruled on other grounds by Bibo v. Jeffrey's Restaurant,* 770 P.2d 290, 295 (Alaska 1989). *See also Holly's, Inc. v. City of Kentwood (In re Holly's, Inc.),* 172 B.R. 545, 563 (Bankr.W.D.Mich.1994), *aff'd,* 178 B.R. 711 (W.D.Mich.1995). Res judicata pre-

cludes subsequent litigation of any claim that was or could have been litigated in the earlier proceeding. *See DeNardo v. State,* 740 P.2d 453, 456 (Alaska 1987); *Heritage Hotel Ltd. Partnership I v. Valley Bank (In re Heritage Hotel Partnership I),* 160 B.R. 374, 377 (B.A.P. 9th Cir.1993), *aff'd,* 59 F.3d 175 (9th Cir.1995); 8 Lawrence P. King, *Collier on Bankruptcy* ¶ 1141.02, at 1141–5 (15th ed.1997).

TEC concedes that the bankruptcy action and the state court action involved the same parties or their privies. Confirmation of a reorganization plan is a final judgment on the merits in bankruptcy proceedings. *See Stoll v. Gottlieb,* 305 U.S. 165, 170–71, 59 S.Ct. 134, 83 L.Ed. 104 (1938); *In re Heritage Hotel Partnership I,* 160 B.R. at 377. The bankruptcy court had subject matter jurisdiction over the state court counterclaim because bankruptcy courts have jurisdiction over "core proceedings," which include "counterclaims by the estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2).[7]

The only remaining question, then, is whether the counterclaim arose from the same cause of action as the claim adjudicated in the bankruptcy proceedings. In its opening brief TEC asserted that the environmental claim arose from a different transaction, involving facts "wholly unrelated to the purchase of the property which gives rise to Christianson's claim and the promissory note that evidences that debt." In its reply brief, however, TEC maintained that its counter-

**6.** Christianson also suggests that the Topes cannot assert the counterclaim now because it belonged not to the Topes but to TEC or TEC's bankruptcy estate. Christianson did not elaborate on this point in his brief, and TEC did not respond to it in its reply brief. Because the parties have given this argument cursory treatment on appeal, we decline to address it. *See Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991). Throughout this opinion we treat the counterclaim as if it belongs to TEC, and as if TEC is attempting to assert it.

**7.** We note that some courts have "held that permissive counterclaims not related to the claim itself cannot be asserted under the core authority of the bankruptcy court." 3 David G. Epstein et al., *Bankruptcy* § 12–2, at 201–02 (1992) (citations omitted). Even if TEC's remediation coun-

terclaim is viewed as such a claim, the bankruptcy court still would have had jurisdiction over it as a matter "related to" a core proceeding. *See* 28 U.S.C. § 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11."); *see also Sanders Confectionery Prods. v. Heller Fin., Inc.,* 973 F.2d 474, 482 (6th Cir. 1992) (explaining that bankruptcy courts can exercise jurisdiction over a matter related to a case under the bankruptcy code, that is, any matter whose outcome "could conceivably have any effect on the estate being administered in bankruptcy," as long as the connection is not "extremely tenuous"). Whether the remediation counterclaim was a core proceeding or not, the bankruptcy court was a court of competent jurisdiction.

claim is a claim in recoupment, not a claim for affirmative recovery, and that "the reduction for environmental damages arises from the same transaction as the underlying liability for the purchase of the property."[8]

When deciding whether two claims are part of the same cause of action, we look to the transaction out of which the claims arose, not to the legal theories asserted. *See State v. Smith,* 720 P.2d 40, 41 (Alaska 1986). "What factual grouping constitutes a 'transaction' is determined by 'whether the facts are related in time, space, origin, or motivation,' and 'whether they form a convenient trial unit.'" *Plumber v. University of Alaska Anchorage,* 936 P.2d 163, 167 (Alaska 1997) (quoting *Restatement (Second) of Judgments* § 24 (1982)).

TEC apparently hoped to show that Christianson was strictly liable for the remediation costs under AS 46.03.822. Assuming for the sake of discussion that that statute applies or defines the applicable standard of care, it appears that it would have required TEC to establish that Christianson owned or had control over the tanks at the time of the leak. *See* AS 46.03.822(a)(1). Christianson would then be strictly liable "for damages, for the costs of response, containment, removal, or remedial action incurred by the state, a municipality, or a village." AS 46.03.822(a); *see also* AS 46.03.822(b)(1)(B), AS 46.03.822(c)-(e). A court reviewing such a claim might consider the possibility that persons other than the property's current owner were also responsible for the leak; the current owner's possible awareness "that a hazardous substance ... was disposed of on, in, or at the facility"; "the relationship of the purchase price to the value of the property if it were uncontaminated"; and the purchaser's "ability to detect contamination by appropriate inspection." AS 46.03.822(a)-(d).

We conclude that any claim TEC might have wished to make under AS 46.03.822 would have required it to prove the same facts that the bankruptcy court would have considered in determining TEC's liability to Christianson. Both claims involve the same property and same sale, and several of the same factual issues—such as the date of purchase, the purchase price, the condition of the land at the time of purchase, the existence of the tanks, the cost of remediation, and the ability to detect the tanks or duty to disclose their existence. Because these facts arise from a single transaction, we conclude that they are part of the same cause of action.

Policy considerations also lead us to conclude that TEC should have raised the counterclaim in the bankruptcy court. *See Howe v. Vaughan (In re Howe),* 913 F.2d 1138, 1140, 1147 (5th Cir.1990) (holding that debtors should have brought their lender-liability claims against creditors during bankruptcy, and that the debtors could not collaterally attack the bankruptcy judgment with the claims five years later). The bankruptcy estate, for instance, includes all property and "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin,* 828 P.2d 745, 754 (Alaska 1992) (reasoning that debtor's malpractice claim against attorney would be an asset of debtor's bankruptcy estate). Adequate information regarding the assets of the estate in the plan of reorganization and disclosure statement is important to creditors who vote on the plan. *See* 11 U.S.C. § 1125 (stating that " 'adequate information' means information of a kind, and in sufficient detail ... that would enable a hypothetical reasonable investor typical of holders of claims or interests ... to make an informed judgment about the plan"). Such information also aids the bankruptcy court in valuing creditors' claims: "[f]undamental to the bankruptcy court's finding of how much [the debtor] owed, was a finding of how much [the debtor] had—what vestigial worth its business had retained." *Sure–Snap Corp. v. State St. Bank & Trust Co.,* 948 F.2d 869, 875–76 (2d Cir.1991) (stat-

---

8. In their motion to set aside the order of dismissal of *Christianson I* and to consolidate the two cases, TEC and the Topes also argued that the payments due under the unsecured promisso-ry note "arise from the same sale of the property, the same transaction at issue in the present litigation, and are subject to the same setoff asserted in defendants' counterclaim."

ing that the debtors "ought to have litigated *all* related facets [of their loan transaction] if they could have done so" in the bankruptcy case, and holding that res judicata prevented the debtors from pursuing their lender-liability claim after confirmation).

We note that there were other creditors who voted and who might have been benefitted by inclusion of the remediation claim in TEC's reorganization plan. The order confirming TEC's plan of reorganization precludes TEC's creditors from attempting to collect on the debts that the order discharges. It would be inequitable to give TEC the benefit of the order's preclusive effect without also requiring TEC to accept the detriment. That is, it would be inequitable to discharge TEC's debts and enjoin future suits by creditors arising from those obligations, without also enjoining future suits by TEC arising from the same obligations.

TEC should have given the bankruptcy court the chance to determine whether TEC was entitled to setoff or recoupment against Christianson, and exactly how much TEC owed Christianson. That determination would have involved the same facts as those surrounding the sale and liability for the leak, and the two claims would have formed a "convenient trial unit" in valuing Christianson's claim. *See Restatement (Second) of Judgments* § 24 (1982). We therefore hold that the remediation claim arose out of the same cause of action as TEC's liability on the note and should have been raised in the bankruptcy case.

█ TEC argues that it reserved its right to proceed with its claim after confirmation, thereby shielding it from the otherwise ineluctable effect of res judicata. TEC claims that a debtor can pursue a claim after confirmation if it provided notice to the other party

regarding the nature of the claim and the debtor's intention to pursue it. In response, Christianson maintains that TEC did not reserve its remediation claim for later adjudication.

█ Res judicata does not prevent a debtor from suing on a cause of action that the debtor expressly reserved for later adjudication. *See D & K Properties Crystal Lake v. Mutual Life Ins. Co.,* 112 F.3d 257, 259–60 (7th Cir.1997); *Kelley v. South Bay Bank (In re Kelley),* 199 B.R. 698, 704 (B.A.P. 9th Cir.1996). The Court of Appeals for the Seventh Circuit has explained: "To avoid res judicata the reservation of a cause of action must be both express, as in writing, and express, as in specifically identified." *D & K,* 112 F.3d at 261. That court reasoned that the language purporting to reserve a claim must be explicit, so that "the parties not only ha[ve] an opportunity to dicker over the language, but [are] thereafter on notice about which claims were reserved and which were not." *Id.* Blanket reservations of rights will not suffice. *See id.*

Courts have occasionally allowed debtors to proceed with a claim after confirmation, especially after finding that the parties were aware of the claim and that the defendant was not harmed by the delay. One court, for instance, reasoned that the failure to reserve a claim was "not fatal," because the plan and disclosure statement made the defendants aware of the possibility of later litigation, and "any damage to the Defendants caused by [the debtor's] lack of disclosure was minimal." *Envirodyne Indus., Inc. v. Connecticut Mut. Life Co. (In re Envirodyne Indus., Inc.),* 174 B.R. 986, 991 (Bankr.N.D.Ill.1994).[9]

TEC's second amended plan of reorganization, which the bankruptcy court confirmed,

---

9. The *Envirodyne* court discussed but did not decide the res judicata issue; it decided the case on other grounds. *See Envirodyne Indus., Inc. v. Connecticut Mut. Life Co. (In re Envirodyne Indus., Inc.),* 174 B.R. 986, 991–92 (Bankr.N.D.Ill. 1994). TEC also relies on a case in which a plan expressly reserved certain causes of action, the court and parties were aware of the claim before confirmation, and the bankruptcy court declined to exercise jurisdiction over the claim. *Terrebonne Fuel & Lube, Inc. v. Placid Refining Co.,* 666 So.2d 624 (La.1996) (allowing debtor to pro-

ceed with claim after confirmation). *Terrebonne,* however, is distinguishable from the instant case because the debtor in *Terrebonne* sought to have its claim heard in the bankruptcy proceeding and TEC did not. *See Terrebonne,* 666 So.2d at 635. The *Terrebonne* court emphasized two findings: first, that before confirmation, the debtor notified the parties and bankruptcy court that it intended to assert the claim; and second, that the defendant was not harmed by allowing the claim to proceed. *See id.*

did not mention TEC's intention to pursue the counterclaim. TEC's amended disclosure statement, however, did describe TEC's claim under 11 U.S.C. § 506(c), and Robert Tope brought one of the storage tanks to court during the bankruptcy hearing. TEC did not conceal the existence of the counterclaim.

Nonetheless, we do not believe that TEC adequately disclosed its intention to pursue the counterclaim after confirmation. Indeed, Christianson objected in August 1990 to TEC's amended disclosure statement of July 1990 because it did not reveal TEC's intent to pursue or abandon the counterclaim. TEC then informed Christianson that it was "prepared to amend the disclosure statement to the effect that the counterclaim against Christianson will survive confirmation, and that pursuit of that counterclaim will depend on the outcome of TEC's pending Section 506 motion...." It then amended the disclosure statement, stating that it assumed that it would prevail in its effort to charge Christianson with the costs under 11 U.S.C. § 506(c), and that it might modify the plan's treatment of Christianson if the § 506(c) motion failed. TEC asserts that its response to Christianson's objection (stating, "the counterclaim against Christianson will survive confirmation") clearly revealed TEC's intent to pursue the claim.

TEC, however, never amended its disclosure statement or its plan of reorganization to include its plans to pursue the counterclaim after the bankruptcy court denied TEC's § 506(c) motion in November 1990. TEC communicated no express reservation of the counterclaim prior to the bankruptcy court's confirmation of TEC's reorganization plan in May 1991. Because there was no evidence establishing an express reservation of the remediation counterclaim communicated to Christianson and the bankruptcy court

before entry of the order confirming the reorganization plan, we feel constrained by the doctrine of res judicata.[10]

TEC's actions after confirmation also support a finding of no express reservation. TEC's attorney prepared and signed a stipulation for dismissal of *Christianson I* (including the environmental counterclaim) with prejudice in October 1991, because the claims had been resolved by the bankruptcy proceedings, and sent the stipulation to Christianson's attorney. TEC's attorney then apparently realized that the counterclaim might be affected and asked Christianson's attorney not to file the *Christianson I* dismissal papers. The record reveals no further action in *Christianson I* by TEC on the counterclaim. Confirmation of a reorganization plan results in termination of the automatic stay on state court proceedings; TEC could have resumed litigation of the counterclaim in the spring of 1991. *See* 11 U.S.C. § 362(c)(2)(C); *In re Space Bldg. Corp.*, 206 B.R. 269, 273 (D.Mass.1996). In February 1993, nearly two years after entry of the order confirming the reorganization plan, the superior court dismissed *Christianson I*, including the counterclaim, for failure to prosecute. TEC's failure to take any action on its remediation counterclaim between the May 1991 confirmation and its June 1996 motion supports the conclusion that it did not reserve the counterclaim.

Assuming that the fact that TEC asked Christianson's attorney in October 1991 not to file the dismissal papers reasonably permits an inference that TEC remained interested in pursuing the remediation counterclaim, that inference would be balanced by TEC's subsequent failure to take affirmative action to prosecute the counterclaim. It also falls short of the sort of express reservation required to preserve the counterclaim from

---

**10.** We note that other courts have emphasized the importance of reserving such claims in documents filed in the bankruptcy court prior to confirmation. *See, e.g., Kelley v. South Bay Bank (In re Kelley)*, 199 B.R. 698, 704 (B.A.P. 9th Cir.1996) (stating, "if the debtor fails to mention the cause of action in either his schedules, disclosure statement, or plan, then he will be precluded from asserting it postconfirmation"); *Harstad v. First Am. Bank*, 39 F.3d 898, 902–03 (8th

Cir.1994) (concluding that debtors should have specifically reserved claims in reorganization plan to warn creditors and bankruptcy court of the possibility of bringing such claims after confirmation); *Heritage Hotel Ltd. Partnership I v. Valley Bank (In re Heritage Hotel Partnership I)*, 160 B.R. 374, 375 (B.A.P. 9th Cir.1993) (holding that res judicata bars the assertion of a claim not reserved in the plan of reorganization or the disclosure statement).

the preclusive effect of the May 1991 order confirming the reorganization plan. Even if we assume that Christianson's failure to object to the request to refrain from filing the dismissal papers in *Christianson I* could imply that TEC had reserved the remediation counterclaim, we do not feel comfortable relying on such slender inferences to undermine the preclusive effect of the bankruptcy court's order.

We conclude that TEC did not expressly reserve its counterclaim. TEC's reorganization plan and disclosure statement did not reveal its intent to reserve the counterclaim. Because the elements of res judicata are satisfied, and because TEC did not reserve the counterclaim, res judicata bars TEC from asserting it now. Because we hold that res judicata bars TEC from asserting the remediation counterclaim now, we need not address Christianson's arguments based on estoppel or the statute of limitations. We also need not consider the Topes' and TEC's motion under Alaska Civil Rule 60(b) to set aside the dismissal of *Christianson I* for lack of prosecution, because TEC would not be able to pursue the counterclaim even if the case were reinstated.

## IV. CONCLUSION

We AFFIRM the superior court's grant of summary judgment to Christianson in *Christianson II* and AFFIRM the superior court's denial of the Topes' and TEC's motion to set aside the dismissal of *Christianson I.*

FABE, J., not participating.